UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 11 |
| NEW ENGLAND COMPOUNDING | ) | |
| PHARMACY, INC., | ) | Case No. 12-19882 (HJB) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**CHAPTER 11 TRUSTEE'S MOTION TO COMPROMISE
CONTROVERSIES AND TO APPROVE PLAN SUPPORT AND FUNDING
AGREEMENT, AND RELATED ESCROW AGREEMENT, WITH
CERTAIN INSIDERS AND AFFILIATES OF DEBTOR,
AND FOR CERTAIN RELATED RELIEF**

Paul D. Moore, the duly appointed chapter 11 Trustee (the "Trustee") of New England Compounding Pharmacy, Inc. (the "Debtor" or "NECC"), hereby moves this Court (this "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A, approving a Plan Support and Funding Agreement (the "Funding Agreement") and associated escrow agreement (the "Escrow Agreement" and, together with the Funding Agreement, the "Agreements") with certain insiders of the Debtor (more particularly identified and defined below in paragraph 7) (collectively, the "Insiders" or the "Contributors"), and granting certain related relief in connection with the Agreements.[1] In support of this Motion, the Trustee respectfully states as follows:

---

[1] An executed copy of the Funding Agreement is attached as Exhibit B. A form of Escrow Agreement is attached as Exhibit C. Capitalized terms used but not defined herein have the meaning ascribed to them in the Funding Agreement or the Escrow Agreement, as applicable.

## PRELIMINARY STATEMENT

1.      The Trustee submits that the proposed settlement is fair and equitable and decidedly in the best interests of NECC, its creditors and its estate. The settlement with the Insiders resolves claims (i) that some of the Insiders received preferential or constructively fraudulent conveyances of distributions of money and other assets from NECC prior to the commencement of NECC's bankruptcy case, and (ii) that some of the Insiders were complicit in, or directly responsible for, the acts and omissions giving rise to the allegations of personal injury and wrongful death resulting from allegedly tainted medications compounded by NECC.

2.      The settlements embodied in the Funding Agreement are a significant step towards funding a chapter 11 plan that will furnish a mechanism to provide meaningful compensation to personal injury claimants with allowed claims who have suffered death, grievous injuries and illnesses from the administration of allegedly contaminated medications compounded by NECC. The settlements embodied in this Agreement will also facilitate, as more particularly described below, the Trustee's settlement with NECC's insurers in an amount in excess of $25 million. Together, these settlements will result in the aggregate recovery by the estate of approximately $100 million and serve as a centerpiece of a chapter 11 plan, which the Trustee hopes to propose and confirm well before the end of 2014, that will maximize the recovery of all creditors on account of their allowed claims.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are Bankruptcy Code Sections 105 and 363 and Federal Rule of Bankruptcy Procedure 9019.

2

## BACKGROUND

4.     On December 21, 2012 (the "Petition Date"), NECC filed a voluntary petition for relief pursuant to chapter 11 of the United States Bankruptcy Code.

5.     On January 24, 2013, this Court entered an order [Docket No. 92] appointing a chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code.

6.     On January 25, 2013 (the "Appointment Date"),  the United States Trustee (the "UST") filed an Application for and Certificate of Appointment of Chapter 11 Trustee [Docket No. 98] (the "UST Application") requesting the appointment of the Chapter 11 Trustee.  The UST Application was granted by order of this Court [Docket No. 99] entered the same day. Thereafter, on February 1, 2013, the Chapter 11 Trustee filed his Verified Statement Pursuant to Rule 2007.1 of Paul D. Moore in Support of Application for and Certificate of Chapter 11 Trustee [Docket No. 111] (the "Statement").

### A.     The Parties to the Funding Agreement

7.     The parties to the Funding Agreement are as follows:

   a.   The Trustee

   b.   Barry Cadden: As of the Petition Date, Barry Cadden owned a 17.5% interest in NECC, and is a director and President of NECC.  Prior to October 2012, he served as Head Pharmacist, and Director of Pharmacy at NECC.

   c.   Lisa Conigliaro Cadden (together with Barry Cadden, the "Caddens"):  Lisa Conigliaro Cadden is the spouse of Barry Cadden.  As of the Petition Date, Mrs. Cadden owned a 17.5% interest in NECC, and served as a director of NECC.

   d.   Carla Conigliaro:  As of the Petition Date, Carla Conigliaro owned a 55.0% interest in NECC, and served as a director of NECC.

   e.   Gregory Conigliaro:  As of the Petition Date, Gregory Conigliaro owned a 10% interest in NECC, and was a director and Treasurer, Secretary, and Vice President of NECC.  Prior to October 2012, he provided non-pharmacy related, business

3

support for NECC. [2]

**B.    The Debtor's Prepetition Operations**

8.    Prior to the Petition Date, NECC operated as a compounding pharmacy. Beginning in September 2012, reports began to surface of several patients who contracted fungal meningitis (the "Outbreak") after receiving injections of preservative-free methylprednisolone acetate ("MPA") compounded by NECC. An investigation was initiated by the Massachusetts Department of Public Health ("MDPH") and, two days later, on September 26, 2012, NECC issued a voluntary recall of three suspect lots, containing 17,646 doses of MPA that NECC had distributed to over 14,000 patients. The Centers for Disease Control and Prevention ("CDC") reported that, as of October 23, 2013, 64 people had died and 751 individuals had fallen ill.[3]

9.    Upon information and belief, on October 1, 2012, the MDPH issued a formal quarantine notice pursuant to M.G.L. ch. 94C, §§ 13 & 189A, and M.G.L. ch. 112, §§ 30 & 42A, requiring NECC to preserve all products used to compound MPA, including products returned from pharmacies.

10.    Upon information and belief, in response to October 2, 2012 findings from the United States Food and Drug Administration ("FDA") and the MDPH, the Massachusetts Board of Registration in Pharmacy (the "Board") voted to request a voluntary surrender of NECC's pharmacy license. NECC surrendered its license effective at noon on October 3, 2012 and further instituted a voluntary recall of all of its intrathecal medications, which are designed for injection near the spinal cord or brain.

---

[2]    Collectively, as of and at all relevant times prior to the Petition Date, the Caddens, Carla Conigliaro, and Gregory Conigliaro were 100% of the shareholders of NECC and were the sole members of NECC's board of directors.

[3]    Reported at http://www.cdc.gov/HAI/outbreaks/meningitis-map-large.html#casecount_table.[3] The CDC has not updated the case counts since October 23, 2013 and indicates that further updates to the case counts are not anticipated.

11.     The FDA and the CDC recommended that all health care providers cease using, and remove from inventory, any NECC products.  At the behest of the MDPH, NECC issued an immediate recall of all of its products, and Barry Cadden and Mr. Glenn Chin (a pharmacist and former employee of NECC) surrendered their pharmacist licenses pending the outcome of the investigation.  There are ongoing proceedings to revoke or otherwise take action against the licenses of Mr. Cadden, Mr. Chin and Ms. Conigliaro Cadden.

12.     The Outbreak has resulted in potentially tens of thousands of claims from personal injury claimants against NECC and others.  NECC claims it initiated this Chapter 11 case in response to the volume and wide geographic distribution of cases it confronted.  As of March 5, 2014, 322 separate lawsuits have been joined in the multi-district litigation pending in the United States District Court for the District of Massachusetts, and are pending before Judge Zobel ("MDL Action").[4]  In addition, prior to the January 15, 2014 bar date for filing of claims in this case, some 3,300 claims asserting injury from injections of MPA have been submitted to the Trustee's claims and noticing agent, Donlin, Recano & Co. (generally, collectively with the pending lawsuits, the "Civil Actions").

13.     Shortly prior to the Petition Date, NECC suspended the operation of its business. NECC also surrendered its Massachusetts pharmacy license and laid off most of its employees. Mr. and Mrs. Cadden agreed at that time to a voluntary license surrender. There are ongoing proceedings at the Board to revoke or otherwise take action against the licenses of Mr. Cadden, Mr. Chin and Ms. Conigliaro Cadden.  The MDPH also has temporarily barred former pharmacists for NECC from practicing pharmacology.

---

[4]     Case No. 1:13-md-02419-FDS, *In re New England Compounding Pharmacy, Inc. Products Liability Litigation.*

5

## C.    The Adversary Proceeding

14.    On January 24, 2013, one day before the Appointment Date, the Official Committee of Unsecured Creditors ("Committee"), on behalf of NECC's bankruptcy estate, commenced in this Court Adversary Proceeding No. 13-01040 (the "Adversary Proceeding") against the Insiders, and sought various forms of prejudgment relief from Debtor affiliates Ameridose LLC ("Ameridose"), GDC Properties Management, LLC ("GDC"), and Medical Sales Management, Inc. ("MSM," and with Ameridose and GDC, the "Reach and Apply Defendants"). In the Complaint, the Committee sought to avoid certain payments to or for the benefit of the Insiders as preferential and constructively fraudulent transfers. The Committee also sought to disallow claims that the Insiders might assert against NECC and to recover damages attributable to alleged breaches of fiduciary duties of loyalty and care that the Insiders allegedly owed to NECC in their capacity as directors of NECC.

15.    On January 24, 2013, the Committee filed in the Adversary Proceeding its Emergency Motion for Temporary Restraining Order and Preliminary Injunctive Relief (the "TRO/PI Motion"), Emergency Motion for Attachment on Trustee Process (the "Trustee Process Motion"), Emergency Motion for Reach and Apply Injunction (the "Reach and Apply Motion"), Emergency Motion for Approval of Real Estate Attachment (the "Real Estate Attachment Motion").

16.    On January 28, 2013, after a hearing on January 25, 2013, the Bankruptcy Court issued the following orders with respect to the Committee's motions:

> (a)    an order partially granting the TRO/PI Motion, and temporarily restraining and enjoining the Insiders (from transferring, encumbering, assigning, pledging, mortgaging, or spending any asset other than as necessary for ordinary living or legal-representation expenses, except by leave of the Bankruptcy Court (the "TRO Order");

> (b)    an order granting the Trustee Process Motion, and ordering the attachment

DM3\2808364.16

of up to $21,110,344.30 on each of six bank accounts held for the benefit of the Insiders (the "Trustee Process Order");

(c)     an order granting the Reach and Apply Motion, and restraining and enjoining the Reach and Apply Defendants (from paying, transferring, distributing, disbursing, or in any way alienating any amounts due or to become due to the Insiders up to $21,110,344.30 (the "Reach and Apply Order"); and

(d)     an order granting the Real Estate Attachment Motion, and approving the pre-judgment attachment of up to $21,110,344.30 on each piece of real property standing in the name of the Insiders in the Commonwealth of Massachusetts (the "Real Estate Attachment Order" and, together with the TRO Order, the Trustee Process Order and the Reach and Apply Order, the "Security Orders").

17.     On February 12, 2013, this Court entered a stipulated order, assented to by the Trustee, the Committee and the Defendants (the "February 2013 Stipulation"), whereby the TRO Order matured into a preliminary injunction and the Trustee was substituted into the Adversary Proceeding for the Committee as the plaintiff therein.

**D.      Claims and Proceedings Against Insiders by Third Parties**

18.     Although not asserted in the Adversary Proceeding, numerous creditors allege that certain of the Insiders are liable to them for various acts and omissions that resulted in the alleged contamination of NECC's products that allegedly caused grievous personal injury and death. The theories of liability are varied; at bottom, the Insiders are alleged to have caused the Outbreak or to be complicit with those who caused the Outbreak in ways that render them civilly liable for the Outbreak.  To the extent that the Insiders caused, are responsible for or are complicit with those who caused or are responsible for the Outbreak, the Trustee believes he also has claims against the Insiders for damage caused to NECC, including claims against NECC and its estate on account of death or personal injury, allegedly resulting from the Outbreak.

19.     Upon information and belief, in addition to the potential and actual civil actions naming some or all of the Insiders as defendants, there are ongoing criminal investigations

7

involving some or all of the Insiders.  Moreover, upon information and belief, multiple state regulatory agencies are seeking to compel those of the Insiders licensed as pharmacists as well as Mr. Chin to surrender, permanently, their licenses.

**E.**   **Settlement Negotiations with the Insiders**

20.   Since the Appointment Date, the Trustee has viewed settlement negotiations with the Insiders in order to avoid protracted and costly litigation as among his highest priorities. Lawsuits naming certain of the Insiders as defendants have been joined in the MDL Action, and are stayed in accordance with orders currently staying litigation, to allow the Trustee to attempt to negotiate a settlement of all claims against these Insiders.  In furtherance of that process, this Court entered its *Agreed-Upon Order Establishing Protocol for Settlement Negotiations and Communication* [Adv. Docket No. 96] ("Protocol Order"), which established protocols to maintain the confidentiality of information disclosed in the context of settlement negotiations among the Trustee and Insiders, and which Protocol Order is binding on the Trustee and Insiders as "Parties", and "Non-Party Participants" (as that term is defined in the Protocol Order).

21.   Subsequently, the Trustee's negotiations with the Insiders spanned many months and focused on many complex issues and theories.  Eventually, and solely for the purposes of trying to arrive at a settlement and reduce the time and cost associated with assessing the strength of the various claims and defenses of all parties to the Adversary Proceeding for the benefit of the tort claimants, the Trustee and the Insiders agreed to focus solely on the scope of assets that would be available to satisfy the Trustee's claims, if he obtained a judgment, and structuring a settlement that provides a return to the Trustee for the benefit of the Debtor's creditors that is equal to or greater than that amount.  In that regard, with the assistance of his financial advisor, and in consultation with the Committee and the Plaintiffs' Steering Committee established in the MDL Action ("PSC"), the Trustee has devoted substantial time and effort to his investigation of

8

the financial condition of the Insiders.  As part of that investigation, the Insiders agreed to provide the Trustee and his advisor with confidential information regarding their financial condition and available assets in furtherance of the settlement process and pursuant to the Protocol Order.

22.     After painstaking review of the results of his investigation, and consultation with his financial advisors and his advisors' detailed review of the confidential information furnished by the Insiders concerning their financial condition and wherewithal, the Trustee, the Committee and the PSC concluded that the contemplated settlement, as set forth in the Funding Agreement, will provide recovery of more funds than likely would have been available under applicable law if the Trustee succeeded in bringing suit against the Insiders for their alleged acts and omissions related to the prepetition operations at NECC and the alleged harm caused by the Outbreak, without the burden, expense, delay and uncertainty of protracted litigation and likely appeals.

### PROPOSED COMPROMISE

23.     The Trustee, in consultation with the Committee and the PSC, has entered into the Funding Agreement to resolve the claims and potential claims between and among the Insiders and NECC's bankruptcy estate.  The essential terms of the Funding Agreement, which is subject to entry of an order approving this Motion, are summarized as follows:[5]

- **Settlement Payments:**  On or before the first Business Day immediately following fourteen (14) days after the date on which the Rule 9019 Order and the MDL Stay Order (discussed below) have both entered and are in effect, in accordance with Sections 3.1 and 3.2 of the Funding Agreement (the "Initial Payment Date"), the Insiders, as Contributors, will each direct a settlement payment to the Trustee, in trust, to be delivered to an escrow account governed by the Escrow Agreement, in the following amounts:  (i) in the case of the Caddens, $21,000,000; (ii) in the case of the Carla Conigliaro,

---

[5]     The description of the proposed settlement and the Funding Agreement in this Motion is only a summary. The Funding Agreement controls in all instances to the extent the summary is incomplete, inaccurate or conflicts with the Funding Agreement.  Parties in interest should review the Funding Agreement in its entirety as to all of its terms and conditions.

$24,000,000; and (iii) in the case of Gregory Conigliaro, $2,750,000, plus any "Additional Consideration" (described immediately below) to the extent such Other Consideration is in the form of cash or cash equivalents and is received by a Contributor on or prior to the Initial Payment Date (collectively, the "Initial Plan Deposits").[6]  The Initial Plan Deposits will be held in escrow and may be segregated in a "qualified settlement fund" as defined in Treasury Regulation Section 1.468B-1 for payment to creditors under a plan on the Plan Effective Date, provided that the order confirming the chapter 11 plan embodying and effectuating the Funding Agreement is a final and non-appealable order or the Parties have waived the final order condition.[7]  If on the Plan Effective Date the Confirmation Order is the subject of an appeal, approximately $10 million of the Plan Deposits will be released from escrow and will be immediately available for distribution in accordance with the confirmed plan, with the remaining funds released when the Confirmation Order becomes a final and non-appealable order. Upon their release, the Trustee shall use the Contributions solely to make distributions to creditors under the Plan, including pursuant to any plan trust established thereunder to make such distributions, and to satisfy the costs and expenses of the administration of the Chapter 11 case. *See* Funding Agreement §§ 2.1, 3.3.

- **Additional Consideration:**  The Contributors shall also provide the following consideration to the Trustee, for the benefit of the Debtor's estate: (i) 75% of the net funds realized by each Contributor from the sale or other disposition of the equity interests in or assets of any of the Pharmaceutical Entities;[8] (ii) 100% of any assets determined to be "Non-Disclosed Assets" as that term is used in the Funding Agreement; (iii) on the Plan Effective Date, all interests of each Contributor in policies of insurance or rights therein that provide, or may provide, coverage for the Debtor, any Contributor or any entity in which any of the Contributors hold an interest (the "Insurance Policies") and the proceeds thereof (with exception of proceeds that represent reimbursement or payment of defense costs); and (iv) 90% of certain federal, state and local "net tax refunds"[9] including any interest paid thereon, received by the Contributors (and their

---

[6]     The Contributors will grant the Trustee a first-priority lien and security interest in any interest held by the Contributors in the funds in the escrow account as well as property that constitutes Additional Consideration (defined below) and the proceeds thereof. See Agreement § 3.4.

[7]     Section 3.3(b) of the Funding Agreement contains a detailed description of the conditions for the release of the Plan Deposits from escrow.

[8]     The "Pharmaceutical Entities" are Alaunus Pharmaceutical, LLC, Ameridose, LLC, Medical Sales Management, Inc., and Medical Sales Management, SW, Inc.  The Funding Agreement obligates the Contributors to provide, for six (6) months following the Plan Effective Date, reasonable cooperation to bring about a sale of Ameridose or its assets in a process that is acceptable to the Trustee (in and after consultation with the Committee and the PSC) or approved by the United States Bankruptcy Court, and provides the Trustee with the discretion to undertake such efforts as he deems appropriate to bring about a sale or other disposition of the Pharmaceutical Entities or of their assets (including Ameridose, if not sold by the sixth month following the Plan Effective Date).  The Trustee's rights to market and sell the Pharmaceutical Entities will expire eighteen (18) months after the Plan Effective Date with respect to Ameridose, and twelve (12) months after the Plan Effective Date with respect to the other Pharmaceutical Entities.

[9]     Under the Funding Agreement, "net tax refunds" as described above are net of reasonable costs and

DM3\2808364.16

spouses) on account of the payment of (A) the funding of the Initial Plan Deposits and (B) certain Additional Contributions (clauses (i)-(iv), inclusive and collectively, the "Additional Contributions"). *See* Funding Agreement § 2.2.

- **Insurance:** As described above, on the Plan Effective Date, the Contributors will assign 100% of the interests of each Contributor in the Insurance Policies and the proceeds thereof. *See* Funding Agreement § 2.2. Thus, allowance of this Motion will permit the Trustee to seek payment from various insurance companies for the benefit of NECC's estate. Consistently, pursuant to a separate Plan Support and Settlement Agreement ("Insurer Agreement"), subject to this Court's approval the Trustee has agreed to settle ("Insurer Settlement") with NECC's primary insurer Pharmacists Mutual Insurance Company ("PMIC") and NECC's excess insurer Maxum Indemnity Company ("Maxum").[10] If consummated, the Insurer Settlement will provide for payments to the Trustee, for the benefit of NECC's estate, in the aggregate principal amount of $25,200,000, and waivers of potentially substantial claims against NECC by the insurers and their insureds. This settlement amount, together with other amounts the Trustee obtains by way of settlement or litigation, will be used to fund a chapter 11 plan intended to provide significant distributions to holders of allowed claims, including those who assert claims for grievous injury or death resulting from administration of allegedly contaminated products compounded by NECC. Under the Insurance Agreement, PMIC will provide a defense to NECC and other insureds, in accordance with the Insurance Agreement, subject to and in accordance with the respective Policies. Generally, other than with respect to these defense obligations, the insurers and insureds will obtain plan releases and injunctions (of course subject and pursuant to the terms and confirmation by this Court of a chapter 11 plan containing such provisions).

- **Plan Releases/Injunctions:** Upon confirmation, the Plan shall provide for a release, on the Plan Effective date, of the Contributor and Affiliate Released Parties[11] from any and

---

expenses, including legal and accounting fees, incurred in seeking refund claims. In that regard, Internal Revenue Code Section 172(f) allows a tax deduction, which may be carried back from the loss year to the prior ten (10) years as a net operating loss, for expenses related to product liability and expenses related to claims on account of product liability. The Contributors agree to take all actions reasonably requested by the Trustee to treat the Plan Deposits, certain other contributions and certain expenses as eligible for the ten (10) year net operating loss carryback provision of the Internal Revenue Code. The Trustee is authorized to segregate a portion of the Escrow and to treat such segregated funds as a "qualified settlement fund" for tax purposes. It is expected that the establishment of a "qualified settlement fund" or "QSF" will optimize the "net tax refunds" available to fund the Escrow. *See* Funding Agreement §§ 3.3(a), 11.

[10]   The Insurer Settlement contemplates settlement of separate insurance policies issued by PMIC and Maxum for the benefit of each of the Caddens and Mr. Glenn Chin, Kathy Chin and others that, pursuant to the Funding Agreement, must be assigned to the Trustee.

[11]   The "Contributor and Affiliate Released Parties" are the Contributors, and the respective spouses, children, parents, and other nuclear family members of each Contributor, all trusts under which the Contributors or their spouses or family members are settlors, trustees, or beneficiaries, the Affiliated Entities identified in Exhibit A to the Funding Agreement, and any other entities in which the Contributors or their spouse, children or other nuclear family members hold an interest, and those entities' successors, assigns, and predecessors.

11

all NECC Claims and any other Claims, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part upon any act or omission, transaction, event or other activity that occurred prior to the Plan Effective Date, in any way relating to or in connection with (i) the Debtor or the Debtor's operations or activities, including but not limited to the compounding, sale and/or distribution or dispensing of MPA, (ii) the Contributor and Affiliate Released Parties' management, control or ownership of, or the employment by, the Debtor, and (iii) the Debtor's estate, the Chapter 11 Case, and the Adversary Proceeding, *except that* the right to enforce the Substitute Lien and the obligations under the Funding Agreement and the Escrow Agreement, and the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder, and the provisions of the Funding Agreement with regard to Non-Disclosed Assets, shall be expressly preserved by the Estate Representative. *See* Funding Agreement § 5.

- **Plan Support:** The Contributors agree to support and not oppose or object to the Plan. *See* Funding Agreement § 4.[12]

- **Waiver and Assignment of Claims:** Effective as of the Plan Effective Date, each Contributor will be deemed to have waived, relinquished and released (i) any and all Claims, of any kind or character, if any, he or she holds against the Debtor or its estate, and (ii) any and all rights to distributions or recoveries, of any kind or character, if any, on account of such Claims including, without limitation, pursuant to a chapter 11 plan for the Debtor (including, without limitation, the Plan). Effective as of the date the Confirmation Order becomes a Final Order, each Contributor will be deemed to have unconditionally assigned and transferred to the Trustee any and all Claims that he or she holds against any person or entity, including, without limitation, any affiliate of the Debtor or any other Contributor, in any way relating to or in connection with the Debtor or any and all products of and/or distributed by the Debtor. *See* Funding Agreement § 6.

- **Stay of Adversary Proceeding and MDL Proceeding:** The Rule 9019 Order will provide for a stay of the Adversary Proceeding through the earlier of the date the Adversary Proceeding is dismissed in accordance with the Funding Agreement or Termination of the Funding Agreement. The stay shall include a stay of all discovery from the Contributors and the Contributor and Affiliate Released Parties in the Adversary Proceeding and a prohibition against any party seeking any form of prejudgment security, including, but not limited to, any attachments, injunctions, writs or orders of any nature in the Adversary Proceeding. *See* Funding Agreement § 3.1(a).

Within ten (10) Business Days following entry of the Rule 9019 Order, the Trustee will

---

[12] Both the Committee and the PSC have indicated their support of the Funding Agreement, including the Plan Support provisions. *See* Addendum to Funding Agreement (providing in pertinent part that "[e]ach of the Committee and the PSC is in favor of the [Funding] Agreement and the compromise and settlement embodied" in the Funding Agreement and that "[e]ach of the Committee and the PSC supports the Bankruptcy Court's approval of the [Funding] Agreement in all respects.").

DM3\2808364.16

file a motion with the MDL Court (the "MDL Stay Motion") requesting entry of an order of the MDL Court staying the MDL Proceeding as to the Contributors and the Contributor and Affiliate Released Parties through the earlier of the Plan Effective Date or Termination of the Funding Agreement (the "MDL Stay Order"). The stay requested in the MDL Stay Motion will include a prohibition against any party to the MDL Proceeding seeking dispositive relief, or any form of prejudgment security, including, but not limited to, any attachments, injunctions, writs or orders of any nature with regard to the Contributors and the Contributor and Affiliate Released Parties, but will permit discovery against the Estate Parties and the Contributors and Affiliate Released Parties, only to the extent the discovery is relevant to the prosecution or defense of claims against defendants other than the Estate Parties and the Contributors and the Affiliated Released Parties. If necessary, the Trustee will seek to enforce the MDL Stay Order, including, but not limited to, by seeking entry of an order of this Court enjoining any person or entity from taking actions or seeking relief in violation of the stay. *See* Funding Agreement § 3.2.

## ARGUMENTS AND AUTHORITIES

### A.    Standard for Determining Motion

24.    Pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure, this Court has authority to approve a compromise or settlement. *See* Fed. R. Bankr. P. 9019(a). The decision to approve a settlement or compromise lies within the discretion of the bankruptcy court, and is warranted when the settlement is found to be reasonable and fair in light of the particular circumstances of the case. *See Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968). In evaluating whether a settlement is fair and reasonable, a bankruptcy court need not be convinced the settlement is the best possible compromise or that the estate has maximized its recovery. Rather a settlement or compromise should be approved as fair and reasonable as long as it does not "fall below the lowest point in the range of reasonableness." *In re Healthco Int'l, Inc.*, 136 F.3d 45, 51 (1st Cir. 1998) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)). The Trustee is better situated than is any individual creditor to determine whether a settlement is in the best interests of the estate, and his informed judgment, after reasonable investigation, to settle and avoid the inherent risks, delays and expense of prolonged litigation is entitled to "wide latitude" from an

inquiring court. *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 212 F.3d 632, 635 (1st Cir. 2000) (citing *Hicks, Muse & Co. v. Brandt (In re Healthco Int'l., Inc.)*, 136 F.3d 45, 50 – 52 (1st Cir. 1998); *Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1145 (1st Cir. 1992)).

25.    When evaluating a proposed compromise, a bankruptcy court must assess and balance the value of the claim that is being compromised against the value to the estate by virtue of the compromise proposed.[13]    Bankruptcy courts consider the following factors in determining whether the proposed settlement is in the best interest of the debtor's estate:  (1) the probability of success in the litigation being compromised; (2) the difficulties to be encountered in the matter of collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay in pursuing the litigation; and (4) the paramount interests of the creditors, and a proper deference to their views.  *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, supra; Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995); *see also In re Martin*, 91 F.3d 289 (3d Cir. 1996).

## B.    The Proposed Compromise is Fair and Reasonable and Should be Approved

26.    The Trustee submits that the proposed compromise embodied in the Funding Agreement is fair and reasonable and should be approved.  The Funding Agreement is the product of extended and intensive good faith, arm's-length negotiations that resolve complex and difficult disputes and produce substantial cash to this estate for the benefit of its creditors.  In

---

[13]    Although not directly on point, this Court's observations in a different case regarding the test for confirmation of a chapter 11 plan where a chapter 11 debtor seeks to provide releases are instructive.  This Court observed that "there are only two questions: and the first one is, is there some consideration for the release; and then the second one is, does the release benefit the estate?"  *In re Northern Berkshire Healthcare, et. al.*, Case No. 11-31114-HJB, Transcript of April 2, 2012 Hearing [Notice of Filing of Transcript at Docket No. 653] at 37::9-13).  The Trustee submits that the releases the Trustee contemplates providing to the Insiders pursuant to the Funding Agreement satisfy this standard.

14

considering the specific *TMT* and *Jeffrey v. Desmond* factors, and the circumstances of this case, the Trustee submits that the fourth factor – the "paramount" interests of creditors – weighs particularly strongly in support of the proposed settlement.[14]  The Trustee is mindful both that the creditors' interests are "paramount" and as yet not vindicated.  Personal injury claimants who have suffered grievous harm and have incurred and continue to incur substantial medical expenses cannot wait, and should not be required to wait, for the resolution of difficult, costly and protracted litigation against the Insiders if the contemplated settlement is not approved.

27.    The Trustee, the Committee and the PSC all have concluded that the amounts to be contributed to NECC by the Insiders represent an amount available for distribution that is roughly a "best case" scenario, in that it is unlikely the estate could collect more from the Insiders, regardless of the nature of the claims the estate may assert against them, even if the estate prevails entirely on all claims.  Further, there is a risk that less might be recovered.  The alleged harm suffered by personal injury claimants appears to dwarf the Insiders' available assets under any realistic analysis.  Thus, the measure of the settlement is not whether the Insiders will have paid enough to satisfy the amounts claimed by creditors, but rather, whether the settlement produces a greater recovery for NECC's bankruptcy estate than is likely to be achieved absent a settlement.  On this measure, the Trustee, the Committee and the PSC generally are in agreement that it does.  Indeed, among other things, the settlement provides the estate with a substantial portion of tax benefits that, but for the settlement, would be unavailable or would accrue solely

---

[14]    The first factor (likelihood of success on the merits) and second factor (difficulties of collection) are not as significant here.  With respect to the first factor, the Trustee believes his position is strong.  Nevertheless, litigation is inherently risky, regardless of the subjective views of the parties of the merits of their respective positions.  With regard to the second factor, the Trustee does not anticipate any difficulty in collection should his position on the coverage issues prevail.  However, the Insiders' assets are at grave risk of loss or diminution from, among other things, the Insiders' potential legal expenses as well as market risk.  It is noteworthy that the Contributions will be held in escrow pending the Plan Effective Date and thereby protected from diminution.

to the Insiders' benefit.[15]    In this fashion at least, the settlement provides the estate with recoveries from assets not otherwise available to the estate through litigation with the Insiders. Likewise, the Insiders all are making substantial contributions out of their available assets, without regard to their alleged respective roles in connection with the Outbreak and their related alleged legal culpability.    Rather, in the Trustee's view, they approached the Settlement with a view that their families should contribute, as soon as possible, as much as they reasonably could, for the benefit of personal injury claimants allegedly harmed by the Outbreak.

28.    The contemplated settlement also eliminates the substantial risk to the estate that such litigation, as well as any ongoing criminal investigations, may have collateral consequences that reduce, if not eliminate, the estate's ability to recover on various insurance policies. NECC's insurers already have raised difficult coverage issues that might reduce or eliminate the insurers' obligations under the applicable policies.    As noted above, the Trustee has reached agreement, subject to this Court's approval, to compromise these coverage disputes with NECC's insurers (*i.e.*, the Insurer Settlement).    As described above, the insurers will pay in excess of $25 million in the aggregate to NECC's bankruptcy estate if these insurer settlements are approved and consummated.    Absent approval of the Funding Agreement, however, it is unlikely that the Insurer Settlement can be consummated, particularly if intervening events in ongoing civil or criminal matters operate to provide the insurers with a basis to contest and deny coverage under the policies.    In a similar vein, NECC's estate clearly would be worse off if the Funding Agreement is not approved and subsequent litigation events were to deprive the estate

---

[15]    *See* Paragraph 23 above, describing the funding of the Escrow Account with 90% of certain "net tax refunds" of the Contributors and their spouses as a result of Internal Revenue Code Section 172(f), which allows a tax deduction, which may be carried back from the loss year) to the prior ten (10) years as a net operating loss, for expenses related to product liability and expenses related to claims on account of product liability.

16

of the ability to access the proceeds of NECC's insurance policies because the Trustee might not have the ability to deliver policy releases that are to be provided by the Insiders under the Funding Agreement,[16] which are a condition to the Insurer Settlement.

29.     Additionally, the contemplated settlement furthers significantly the progress of NECC's bankruptcy case and provides a structure of, and support for, a contemplated chapter 11 plan.  The Funding Agreement includes plan support provisions, whereby the Insiders agree to support a plan that (i) incorporates the Funding Agreement, and (ii) provides them with third party releases.  As the Trustee has made clear previously, a plan that leverages settlements with parties potentially responsible for the Outbreak, including the Insiders, in return for substantial payments that would fund a "pot" for distributions to holders of allowed claims, is precisely the type of plan the Trustee envisions as the vehicle to maximize payments to personal injury claimants allegedly harmed by the Outbreak.  As evidenced by paragraph 3 of the addendum to the Funding Agreement, the Committee and the PSC support the Court's approval of the Funding Agreement "in all respects."  By definition, this includes the plan support provisions that contemplate a chapter 11 plan containing the necessary third party releases.  The support by the Committee and the PSC for approval of the Agreement and the contemplated plan structure evidences that creditors will overwhelmingly vote to accept the plan.  Indeed, none of the hypothetical alternatives to the contemplated plan will produce more for creditors than will the plan.

30.     Under these circumstances, the Trustee does not believe the "paramount" interests of creditors are served if the Trustee is compelled to forego this settlement, including the tax-

---

[16]     As noted above, the Insiders are entitled to payment of their defense costs under some or all of the insurance policies.  The Caddens and Glenn Chin also are the beneficiaries of policies issued in their favor by one of NECC's insurers.  As such, the insurers have conditioned their settlement with the Trustee on securing "policy releases" from all of their insureds, including each of the Insiders.

DM3\2808364.16

related additional payments available to the estate exclusively by operation of the settlement, risk loss or diminution of assets the estate might look to recover in any litigation, risk strengthened insurance coverage challenges that, if successful, would deprive the estate of substantial amounts from NECC's insurers, and instead pursue complex and difficult litigation that is likely to remain unresolved for the indefinite future. Likewise, it decidedly is not in the interests of creditors, particularly those who allegedly suffered personal injury as a result of the Outbreak and reportedly are struggling financially as a result of substantial, ongoing medical expenses and reduced or lost employment, to forego the settlement of approximately $100 million of aggregate recovery that will be realized from it and the related insurance settlements and instead pursue complex and difficult litigation.

31.    Finally, as noted above, the Committee and the PSC support this Motion and assent to the requested relief. Thus, the Trustee's "proper deference" to the views of the creditors further supports the determination that the contemplated settlement is fair and reasonable and that this Motion should be allowed.

## C.    The Plan Support Provisions of the Funding Agreement Fostered the Settlement Negotiations, are Fair and Reasonable, and Should be Approved

32.    As noted above, the Funding Agreement (in Section 4) contains extensive provisions that require the Insiders to support the Trustee's contemplated plan under certain terms and conditions. These "plan support provisions" are a significant component of the settlement and a material term in the Funding Agreement, and should be approved.

33.    The case law on the propriety of plan support agreements is evolving. Most recently, the court in *In re Indianapolis Downs, LLC,* 486 B.R. 286 (Bankr. D. Del. 2013) denied a request by certain creditors to designate the votes of other creditors to a "Restructuring Support Agreement" and not count those votes pursuant to 11 U.S.C. §§ 1125(g) and 1126(e). In denying

the motion, the court relied upon *In re Century Glove,* 860 F.2d 94 (3rd Cir. 1988).  In *Century Glove*, which the *Indianapolis Downs* court characterized as the "seminal case [in the Third Circuit] construing solicitation and the designation of votes," the court affirmed the denial of a motion to designate votes of a creditor who had circulated an alternative plan to the creditors committee seeking to garner that body's support.  The Third Circuit ruled that "solicitation must be read narrowly" and that a broad reading "can seriously inhibit free creditor negotiations." *Id.* at 101.

34.    Although this Court has questioned the Third Circuit's reasoning in *Century Glove*, this Court's precedent is entirely consistent with *Indianapolis Downs* and its holding that creditors signing a plan support agreement have not violated the bankruptcy code.  In *In re Clamp-All Corp.*, 233 B.R. 198 (Bankr. D. Mass. 1999), a creditor filed an objection to a disclosure statement, attaching as an exhibit a full copy of a disclosure statement and alternative, competing reorganization plan.  This Court held that such conduct violated Sections 1121(b) and 1125(b) of the Bankruptcy Code as well as Federal Rule of Bankruptcy Procedure 3017(a).  Nevertheless, this Court emphasized that "open negotiation by creditors is imperative." *Id.* at 206.    This Court characterized the "difficult task" as "distinguishing between permissible negotiations and prohibited solicitations. . . ." *Id.*  To pass muster as permissible negotiations, such "negotiations must be conducted in a manner consistent with the policy goals intended by Congress to be effectuated through sections 1121(b) and 1125(b) of the Bankruptcy Code." *Id.*

35.    This Court's principal disagreement with *Century Glove* concerned the impairment of a chapter 11 debtor's exclusive right to solicit acceptances and rejections of a plan under 11 U.S.C. § 1121(d) arising from the disclosure by dissenting creditors of a potential,

19

alternative plan.[17]  Exclusivity concerns do not exist here, as NECC's exclusive rights to solicit

acceptances and rejections of a plan were terminated, pursuant to 11 U.S.C. § 1121(c)(1), on the

Appointment Date.  Here the parties entered into the plan support agreement to build support for,

and not rejection of, the Trustee's contemplated plan of reorganization.  Indeed, section 4 (a) of

the Funding Agreement contemplates that solicitation of the Insiders' votes will occur separately,

in accordance with 11 U.S.C. §§ 1125 and 1126, and expressly conditions the Insiders'

commitments to vote to accept the plan on the subsequent, proper solicitation of the Insiders'

votes pursuant to those sections of the Bankruptcy Code.  The potential impairment of NECC's

terminated exclusivity rights under 11 U.S.C. § 1121, so critical to this Court's *Clamp-All*

opinion, simply is not at issue or relevant here.

36.    The remaining concern raised by *Clamp-All* is whether the negotiations and the

plan support provisions of the Funding Agreement "are consistent with the policy goals intended

by Congress to be effectuated through section[ ] . . . 1125(b) of the Bankruptcy Code."  *Id.* at

206.  Section 1125(b) requires a written disclosure statement, approved by the bankruptcy court

as containing adequate information, be transmitted to creditors, together with a plan or a

summary of the plan, prior to any post-petition solicitation of votes for or against the plan.  *Id.* at

208.  This Court noted that the requirement of advance court approval "was thought to

discourage the undesirable practice . . . of soliciting acceptance or rejection at a time when

creditors and stockholders were too ill-informed to act capably in their own interests."  *Clamp-
All Corp.*, 233 B.R. at 206 (citations and internal quotations omitted).

---

[17]    This Court wrote: This Court believes that the *Century Glove* analysis fails to sufficiently recognize
Congress' intention to allow the debtor a reasonable time to obtain confirmation of a plan without the threat
of a competing plan.  Therefore, whether a creditor's action during the exclusivity period violates § 1121(b)
must be evaluated not only in terms of its effect on the ability of a debtor to delay reorganization, but also
in terms of its interference with the debtor's efforts to propose and confirm a plan of reorganization.
*Clamp-All*, 233 B.R. at 207-08 (citation omitted).

37.    Unlike with respect to the Section 1121 issues, *Indianapolis Downs* not only is consistent with *Clamp-All* with respect to the Section 1125 issues, but, indeed, cites to *Clamp-All* in finding that "the interests that § 1125 and the disclosure requirements are intended to protect are not at material risk [from the plan support agreement] in this case." *In re Indianapolis Downs, LLC*, 486 B.R. at 295-96.  Here, as in *Indianapolis Downs*, the Insiders "are all sophisticated. . . players and have been represented by able and experienced professionals throughout these proceedings." *Id.* at 296.  "[T]he entities whose votes are targeted [here, the Insiders] cannot seriously be characterized as too ill-informed to act capably in their own interests." *Id.* (quoting *In re Heritage Organization, LLC*, 376 B.R. 783, 794 (Bankr. N.D. Tex. 2007)).

38.    In sum, this Court acknowledged that "the *Century Glove* court's concern that a broad reading of § 1125(b) could limit creditor communications and negotiations." *Clamp-All*, 233 B.R. at 209.  Such an anomalous result, which *Indianapolis Downs* avoided partly in reliance upon *Clamp-All*, would occur here if this Court does not approve the plan support provisions of the Funding Agreement.  The negotiations and the Funding Agreement are all "consistent with the policy goals intended by Congress to be effectuated through . . . the Bankruptcy Code." *Clamp-All*, 233 B.R. at 209.  There is no plan competing with or proposed as an alternative to the Trustee's contemplated plan that the Insiders were solicited to accept. NECC's exclusivity period has terminated, and the Funding Agreement contemplates, and is conditioned upon, subsequent, proper solicitation of all votes, including those of the Insiders, under Bankruptcy Code Sections 1125 and 1126.  The plan support provisions operate to ensure the Insiders do not seek to interfere with confirmation of the Trustee's contemplated plan or take any other action that may result in the escrowed settlement funds being returned to them rather

DM3\2808364.16

than used to fund payments to holders of allowed claims under a plan. The plan support provisions operate to foster, rather than disrupt, the formulation and confirmation of the Trustee's plan to maximize the recovery of creditors consensually, without a battle between competing plans. Accordingly, the Trustee submits that this Court can and should approve the Funding Agreement in its entirety, including the plan support provisions in section 4 thereof.

**D.     The Court Should Modify the Security Orders to the Extent Necessary for the Contributors to Make the Payments and Transfers Required by the Funding Agreement**

39.     As discussed above, the Funding Agreement requires the Contributors to make certain cash payments and other transfers that will provide funding for the Plan. The provisions of the Security Orders, however, may be construed as limiting the Contributors' ability to do so. In particular:

- the TRO Order restrains each of the Contributors from transferring, encumbering, assigning, pledging, mortgaging, or spending any asset other than as necessary for ordinary living or legal-representation expenses, except by leave of this Court;

- the Reach and Apply Order restrains the Reach and Apply Defendants from paying, transferring, distributing, disbursing, or in any way alienating any amounts due or to become due up to $21,110,344.30 to the Contributors, pending further order of this Court;

- The Trustee Process Order approves the attachment of up to $21,110,344.30 on each of six bank accounts held for the benefit of each of the Contributors (and trustee process summons were issued to each bank); and

- The Real Estate Attachment Order authorizes writs of attachment of up to $21,110,344.30 on each piece of real property standing in the name of each of the Contributors in the Commonwealth of Massachusetts (and such writs did in fact issue).

Accordingly, the Trustee requests that the Security Orders be modified solely to the extent necessary to enable the Contributors to make the transfers of property required of them under the Funding Agreement, but remain in full force and effect until the Escrow Agent's receipt from or

22

on behalf of each Contributor of his, her or their respective Initial Plan Deposit (and, at such time, the Security Orders will dissolve and the Trustee will be granted the Substitute Lien (as described below)).  Given that those transfers will provide funding for the Plan and therefore inure to the benefit of the Debtor's estate, the Trustee submits that there is ample cause to modify the Security Order to permit those transfers.

**E.     The Court Should Dissolve the Security Orders and Grant the Substitute Lien**

40.     Under the Funding Agreement, the Parties have agreed that the Security Orders will be dissolved and of no further effect upon the Escrow Agent's receipt from or on behalf of each Contributor his, her or their Initial Plan Deposit in the amount owing by such Contributor or Contributors (in the case of married parties).  *See* Funding Agreement § 3.1(d).  In turn, as substitute security, the Contributors have agreed to grant the Trustee a first-priority lien and security interest in any interest held by the Contributors in (i) the Escrow (ii) all funds that may at any time be on deposit in the Escrow and (iii) property that at any time constitutes Additional Consideration and the proceeds thereof, pending the release of all Plan Escrowed Funds from the Escrow to the Trustee (the "Substitute Lien").  *See* Funding Agreement §§ 3.1(e); 3.4.

41.     The Trustee hereby requests that the Court dissolve the Security Orders and grant the Substitute Lien as described above, and as more fully set forth in the Funding Agreement and in the proposed order attached hereto.  The Trustee submits that such relief is appropriate and in the interests of the estate.  More specifically, the Trustee will replace his existing security that includes non-cash assets with new security comprised of cash and cash equivalents, whose value can be immediately realized and in a value that exceeds the amount presently subject to the Trustee Process Order.

DM3\2808364.16

F.    **The Court Should Stay The Adversary Proceeding Pending Consummation of the Settlement**

42.    The Funding Agreement also provides that the Trustee shall seek a stay of the Adversary Proceeding in all respects until the earlier of the Plan Effective Date or the termination of the Funding Agreement. *See* Funding Agreement §§ 3.1(a), 9(h). The Trustee submits that a stay of the Adversary Proceeding as proposed is prudent and in the interests of the estate, as it will allow the parties to singularly focus on implementing and consummating the Plan. The stay will not prejudice the Trustee's or the estate's rights, as it will terminate if the Funding Agreement terminates and the Trustee will have the benefit of the Substitute Lien while the stay remains in effect. Accordingly, the Trustee requests that the court grant a stay of the Adversary Proceeding in tandem with approval of the Funding Agreement, as more fully set forth in the Funding Agreement and in the proposed order attached hereto.

G.    **The Court Should Approve the Establishment of One or More "Qualified Settlement Funds" to Hold a Portion of the Plan Deposits**

43.    Under the Funding Agreement, the Trustee and the Contributors (and their spouses) have agreed to remit to the Escrow Agent 90% of certain federal, state and local tax refunds that may be received by the Contributors and their spouses.

44.    Under the Internal Revenue Code, and in particular Section 172, net operating losses are allowed to be carried back as a net operating loss deduction and various carryback periods are permitted for various types of losses. Significantly, a ten (10) year carryback period is allowed for a specified liability loss which is a payment (and certain expenses) related to claims on account of product liability; absent special rules, a net operating loss may be carried back to each of the two taxable years preceding the year of loss. Since 1993, Treasury Regulations have allowed taxpayers that satisfy certain liabilities to claim the deduction when payments are made to a "qualified settlement fund" or "QSF" when all of the QSF requirements

24

are satisfied.  A QSF is a mechanism that allows a taxpayer to deduct payments in the year that the taxpayer funds the QSF, even if the fund itself does not actually disburse payments to creditors until subsequent years.  *See* Treasury Regulation Sections 1.468B-1 through 1.468B-5. The Trustee and the Contributors desire to establish one or more "qualified settlement funds" under the Escrow Agreement so as optimize the timing and amount of certain tax refunds for the benefit of the estate and its creditors.  Therefore, the Escrow Agreement directs the Escrow Agent to segregate, administer and take all appropriate actions to permit a portion of the Escrow Account to constitute one or more "qualified settlement funds."  *See* Escrow Agreement ¶ 6.

45.    A QSF, and in this case any portion of the Escrow Account permitted to operate as a QSF, must: (1) be established pursuant to an order of, or approved by a government, governmental agency or instrumentality, including a court of law; (2) be established to resolve or satisfy one or more contest or uncontested claims arising out of a tort, breach of contract or violation of law; and (3) have its assets segregated from other assets of the transferor (and related persons).   The fund is "ordered by" or "approved by" a governmental authority when the authority issues its initial or preliminary order to establish, or grants its initial or preliminary approval of, the fund, even if that order or approval may be subject to review or revision.  *See* Treasury Regulation Section 1.468B-1(c) and (e*).*

46.    This Court's approval of the Escrow Agreement (pursuant to which the QSFs will be established) is necessary to satisfy the QSF requirements and to optimize the timing and amount of certain tax refunds of the Contributors (and their spouses) for the benefit of the estate and its creditors.  Therefore, the Trustee hereby requests that this Court approve the Escrow Agreement in its entirety, including the provisions necessary to permit any portion of the Escrow Account to operate as a "qualified settlement fund", so as to maximize the tax benefits for the

25

estate.

## CONCLUSION

47.    In summary, the Trustee submits that approval of the Funding Agreements is both necessary to cause the expeditious administration of the Debtor's estate and payment to the Debtor's creditors, and appropriate as reflecting the paramount interest of the Debtor's creditors in receiving compensation for injuries allegedly caused by the Debtor and the various components of this complex case. Ultimately, the Trustee will propose a plan of liquidation that will provide for distribution of the Contributions and any other contributions from third-parties procured by the Trustee to the holders of tort claims on a *pro rata* basis. Approval of the Funding Agreement represents the first step towards achieving confirmation of that plan and implementing the mechanism for liquidation and payment of tort claims upon plan confirmation. The Trustee, therefore, requests that this Court enter an Order approving the Agreements in the form attached hereto to move the case significantly closer to final resolution.

**WHEREFORE**, the Trustee respectfully requests that this Court approve this Motion and the Agreements attached hereto as Exhibits B and C, and grant the related relief requested herein, by entering an order substantially in the form attached hereto as Exhibit A, and grant the Trustee such other and further relief as this Court deems just and proper.

Dated:    May 6, 2014                    Respectfully submitted,
          Boston, Massachusetts


              **DUANE MORRIS LLP**

              By: /s/ Jeffrey D. Sternklar
              Jeffrey D. Sternklar  (BBO #549561)
              100 High Street, Suite 2400
              Boston, MA 02110-1724
              Phone: (857) 488-4200
              Fax: (857) 488-4201
              Email: jdsternklar@duanemorris.com

26

DM3\2808364.16